01

02

03

04

05

06

07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

08 SAMUEL MERCADO-ULLOA,                )   CASE NO. C04-2463-JCC
                                        )                (CR96-415-JCC)
09        Petitioner,                   )
                                        )
10    v.                                )   REPORT AND RECOMMENDATION
                                        )
11 UNITED STATES OF AMERICA,            )
                                        )
12        Respondent.                   )
   _____ )

13

14                          INTRODUCTION

15        Petitioner Samuel Mercado-Ulloa, proceeding with counsel, filed a motion to vacate his

16 judgment and sentence pursuant to 28 U.S.C. § 2255.  (Dkts. 29 & 48.)  Petitioner asserts

17 ineffective assistance of counsel in violation of the Sixth Amendment, as well as newly discovered

18 evidence and governmental misconduct.  He requests an evidentiary hearing.  Respondent filed an

19 answer to the petition, arguing that petitioner's request for an evidentiary hearing and his habeas

20 petition should be denied.  (Dkts. 43 & 46.)  This Court, having reviewed petitioner's § 2255

21 petition, all papers and exhibits in support and in opposition to that petition, and the balance of

22 the record, concludes that an evidentiary hearing is not necessary and that  petitioner's § 2255

01  petition should be denied.

02  <u>PROCEDURAL BACKGROUND</u>

03  On September 6, 1996, petitioner was convicted in a jury trial in this Court with conspiracy

04  to distribute cocaine, distribution of cocaine, and possession of cocaine with intent to distribute.

05  The Court sentenced petitioner to 240 months confinement, followed by five years of supervised

06  release.  Carol Koller, of the Federal Public Defender's Office, represented petitioner at trial and

07  sentencing, but thereafter withdrew as counsel.

08  With newly-appointed counsel, petitioner appealed his conviction in the Ninth Circuit

09  Court of Appeals.  His counsel argued that evidence obtained pursuant to a search warrant should

10  have been suppressed, that a law enforcement witness and the prosecutor impermissibly vouched

11  for the informant involved in the case, and that the admission of post-arrest statements from his

12  co-defendant Gilbert Sanchez and the informant's testimony linking petitioner to the Mexican

13  Mafia denied him a fair trial.  (Dkt. 43, Ex. A.)  In a supplemental *pro se* brief, petitioner argued

14  that the government failed to timely disclose exculpatory evidence in the form of post-arrest

15  statements made by Sanchez in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  (*Id.*, Ex. J.)

16  Petitioner asserted that Sanchez denied that he worked for petitioner or had any knowledge

17  regarding petitioner's involvement in cocaine trafficking, and attempted to provide information

18  about his cocaine suppliers in California.  (*Id.*)  In an unpublished decision dated March 5, 1998,

19  the Ninth Circuit affirmed petitioner's conviction.  (*Id.*, Ex. A.)

20  On March 5, 1999, acting *pro se*, petitioner filed a § 2255 petition in this Court.  *See*

21  *Mercado-Ulloa v. United States* , No. C99-314JCC.  He identified ten grounds for relief: (1)

22  ineffective assistance of counsel; (2) lack of evidence; (3) prosecutorial misconduct through

REPORT AND RECOMMENDATION
PAGE -2

01  suppression of evidence and witnesses; (4) outrageous government conduct through oppression

02  to induce false statements and intimidation of material witnesses; (5) abuse of discretion; (6) lack

03  of jurisdiction; (7) illegal search and seizure; (8) outrageous government terrorism; (9) actual,

04  factual, and legal innocence; (10) miscarriage of justice. *Id*. (Dkt. 1).  United States Magistrate

05  Judge David Wilson rendered a Report and Recommendation recommending denial of the petition

06  based on the fact that it contained merely a list of conclusory allegations, without any supporting

07  facts or legal argument. *Id*. (Dkt. 19).  The Court adopted the Report and Recommendation and

08  denied the petition. *Id*. (Dkt. 22).

09      In May 2003, petitioner filed a motion in the Ninth Circuit Court of Appeals seeking

10  permission to file a second or successive § 2255 petition. *Id*. (Dkt. 23).  He based his request on

11  a letter sent to this Court in May 2001 in which Sanchez stated that petitioner had nothing to do

12  with the drug activity at issue in this case, and on an investigation of his then attorney, John Reed,

13  into the tapes introduced and transcripts used at trial.  On August 31, 2003, the Ninth Circuit

14  granted petitioner's request to file a successive petition. *Id*.

15      On December 13, 2005, petitioner, again acting *pro se*, filed his successive petition in this

16  Court.  (Dkt. 1.)  Upon petitioner's motion, the Court appointed counsel.  (Dkt. 9.)  Petitioner

17  now proceeds pursuant to an amended petition filed by his counsel.  (Dkt. 29.)

18                              EVIDENCE AT TRIAL

19      Following his arrest for drug dealing in the spring of 1996, Isauro Ontiveros Pantoja

20  entered into a cooperation agreement with the Unified Narcotics Enforcement Task Force

21  (UNET).  Trial Record (TR) 61-62, 131-33.  Pursuant to that agreement, Pantoja identified as a

22  drug dealer, among others, Samuel Mercado.  TR 66, 135, 174.

REPORT AND RECOMMENDATION
PAGE -3

01          Acting under the supervision of UNET officers, Pantoja attempted to locate Mercado in

02   Bellingham, Washington.   TR 66, 137, 217.   Upon discovering that Mercado's Bellingham

03   restaurant had closed, Pantoja left a message with his telephone number for Mercado at a different

04   Mexican restaurant in the area. TR 137-39, 217-18.  Pantoja received a return telephone call from

05   Gilbert Urrea Sanchez, a previous acquaintance.  TR 139-40, 229.  He arranged a meeting with

06   Sanchez in Centralia, Washington.  TR 141, 233-35.

07          Pantoja and Sanchez met in late April 1996.  TR 69.  They discussed prices for a kilogram,

08   or kilo, of cocaine.  TR 237-38.  Pantoja inquired about quarter kilos, but Sanchez informed him

09   that they only wanted to deal in kilos, at the price of $21,000.00.  *Id.*  Pantoja testified at trial that

10   Sanchez told him he (Sanchez) was working with Mercado selling drugs, that Mercado was going

11   back to California, and that he was temporarily taking over Mercado's business during Mercado's

12   absence. TR 239-40.  Pantoja indicated he could get the money for half a kilo, and Sanchez told

13   him he would speak with Mercado and thought that would be acceptable.  TR 241.  Sanchez told

14   Pantoja to contact him using Mercado's pager number and to use a particular type of code to

15   conduct business.  TR 240-42.

16          On May 8, 1996, Pantoja contacted Sanchez via the pager number and arranged to

17   purchase a kilo of cocaine. TR 145.  Pantoja and Sanchez met the following day. TR 70, 145-47,

18   245.  Pantoja wore a body wire to record their conversation.  TR 70.  Sanchez informed Pantoja

19   that Mercado did not want to sell him the cocaine, noting Pantoja's recent arrest.  TR 190, 246-

20   50.  Pantoja told Sanchez he wanted to speak directly to Mercado and Sanchez agreed to relay

21   the message. TR 250.  UNET detectives followed Sanchez after the meeting and noted his driving

22   appeared consistent with an effort to avoid surveillance.  TR 72-75.  Sanchez eventually drove to

REPORT AND RECOMMENDATION
PAGE -4

01   8848 Northwood in Lynden, Washington, the address at which Mercado resided. TR 74.

02         Pantoja testified that he called the pager number following the May 9, 1996 meeting and

03   received a call from Mercado the next day. TR 251. Pantoja described Mercado as saying that

04   "things were a little hot," but that he was willing to "do the deal" if Pantoja had the money. *Id*.

05   Mercado said he would send Sanchez to Centralia with the kilo. TR 252.

06         Pantoja met Sanchez in Centralia on May 11, 1996 with the intention of purchasing a kilo

07   of cocaine. TR 76, 252-53. He had $11,000.00 given to him by UNET detectives and would be

08   fronted the remainder of the kilo. TR 70, 253. Sanchez told Pantoja that the cocaine was under

09   the hood of his car near the battery. TR 253. Pantoja drove Sanchez's vehicle to a predetermined

10   location and gave the kilo to UNET detectives. *Id*. He then delivered the money to Sanchez and

11   they further discussed the use of codes to arrange drug deals. TR 254-56. The government

12   introduced at trial a piece of paper on which Sanchez wrote down the codes. *Id*. Sanchez spent

13   that night at Pantoja's house. TR 254. The following day, UNET detectives followed Sanchez

14   to the 8848 Northwood address in Lynden. TR 80-81.

15         Pantoja arranged another meeting in Bellingham for May 14, 1996. TR 81. He testified

16   that he called the pager number once he arrived in Bellingham and received a call in return from

17   Mercado. TR 257. Pantoja then met with Mercado and Sanchez at a McDonalds. TR 258.

18   Again, Pantoja wore a body wire to record the conversation. TR 266. Pantoja testified at trial

19   that they discussed at that meeting, *inter alia*, the use of codes to arrange drug deals, getting jobs

20   pruning trees in order to give an appearance of legitimacy, the need for Pantoja to obtain a pager,

21   places to meet, and Mercado and Sanchez making trips to California. TR 259-62, 267-75.

22         Pantoja testified that he subsequently tried unsuccessfully to contact Sanchez and

REPORT AND RECOMMENDATION
PAGE -5

01  Mercado.  TR 275.  Sanchez eventually called Pantoja and told him they were on their way back

02  from California.  TR 275-76.  Pantoja arranged a buy to take place in Chehalis.  TR 157-58, 276-

03  77.  UNET detectives used the pager and entered the code for two kilos of cocaine.  TR 158.

04  Drug Enforcement Administration (DEA) Special Agent Jeffery Pullig testified that he

05  conducted surveillance at Mercado's residence on May 30, 1996.  TR 344.  He observed Mercado

06  reaching into the trunk of a Chrysler Cordoba at that residence.  TR 344-46.  Shortly thereafter,

07  he observed Sanchez drive the car away.  TR 346-47.

08  Pantoja met Sanchez in Centralia on May 31, 1996.  TR 277.  Pantoja again drove

09  Sanchez's car and delivered the kilo of cocaine contained within to UNET detectives. TR 83-84.

10  The UNET detectives instructed Pantoja to deliver a dummy package of cash to Sanchez.  TR 84.

11  The agents followed Sanchez on his drive back to Bellingham with the package.  TR 85.  Sanchez

12  again engaged in counter-surveillance and the UNET detectives, joined by DEA agents, stopped

13  him and placed him under arrest.  TR 85-87.

14  UNET detective Thomas Zweiger testified that, after his arrest, Sanchez said he was not

15  the one making all the money off the drugs and that he merely worked for someone in the

16  Bellingham area.  TR 87.  Sanchez told the law enforcement agents that he lived at 1931

17  Humboldt Street in Bellingham and had six kilos of cocaine hidden in his car at that house.  TR

18  88.  He accompanied UNET detectives to his residence and consented to a search of his house and

19  car. TR 88-89.  The officers searched a 1979 Chrysler Cordoba at Sanchez's house and recovered

20  from within the car six kilos of cocaine inside a black and gray tweed bag with red vinyl trim.  TR

21  89.  They also found $4000.00 in cash in Sanchez's house.  TR 90.

22  On June 1, 1996, DEA Special Agents and UNET detectives served a search warrant for

REPORT AND RECOMMENDATION
PAGE -6

01  Mercado's residence. TR 90-91. They recovered the pager used by Sanchez to receive calls from

02  Pantoja, $5000.00 in cash found in a closet, $3000.00 in cash found in Mercado's wife's purse,

03  and a tweed bag identical to the bag found in the Chrysler Cordoba. TR 91-92, 163-64.

04      At trial, the landlord of the residence at 1931 Humboldt Street in Bellingham testified that

05  she met a male, "Israel," and female, "Maria," interested in renting the house in late April or early

06  May 1996. TR 328-29. The landlord identified Mercado in court as Israel. TR 329. Mercado

07  told the landlord he was seeking to rent the house for his boss, Gilbert Sanchez, and that they

08  worked planting trees and would be out of town a lot. TR 330-31. He paid a deposit of $300.00

09  from a large amount of cash on his person and later stopped by to pay the $700.00 first month's

10  rent in cash. TR 332-34. The landlord saw Mercado leaving the house a week later and, at that

11  time, met Sanchez. TR 335.

12      The government admitted tapes of the May 9th and May 14th conversations into evidence

13  at trial. TR 249, 266. The tapes were not played at trial, but the Court allowed the government

14  to use transcripts of the tapes to assist the jury. TR 177-79, 248, 266-67.

15      Neither Mercado, nor Sanchez testified at trial. Petitioner's counsel called Vasario Rubio,

16  who testified that he purchased a 1987 Dodge Caravan from Mercado's wife. TR 367-68. He

17  paid $1000.00 down and was late with the rest of his payments. *Id*. Mercado's wife contacted

18  Rubio on May 12, 1996 and asked him to pay the rest of the money. TR 369. He paid the

19  remainder of the amount due in cash on May 26, 1996. TR 370.

20                                    <u>DISCUSSION</u>

21      As noted above, petitioner raises two ground for relief and requests an evidentiary hearing.

22  A § 2255 petitioner "is entitled to an evidentiary hearing, '[u]nless the motion and the files and

REPORT AND RECOMMENDATION
PAGE -7

01  records of the case conclusively show that the prisoner is entitled to no relief[.]'" *United States*

02  *v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (quoting 28 U.S.C. § 2255).  The Ninth Circuit

03  characterizes this standard as asking whether "'the movant has made specific factual allegations

04  that, if true, state a claim on which relief could be granted.'"   *Id*. (quoting *United States v.*

05  *Schaflander*, 743 F.2d 714, 717 (9th Cir. 1984) ("A hearing must be granted unless the movant's

06  allegations, when viewed against the record, do not state a claim for relief or are so palpably

07  incredible or patently frivolous as to warrant summary dismissal."))  In this case, the undersigned

08  concludes that, because petitioner fails to state a claim on which relief can be granted, his request

09  for an evidentiary hearing and habeas relief should be denied.

10  A.      Ineffective Assistance of Counsel

11         The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

12  counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Courts evaluate claims of

13  ineffective assistance of counsel under the two-prong test set forth in *Strickland*.  Under that test,

14  a defendant must prove (1) that counsel's performance fell below an objective standard of

15  reasonableness and (2) that a reasonable probability exists that, but for counsel's error, the result

16  of the proceedings would have been different.  *Id*. at 687-94.

17         When considering the first prong of the *Strickland* test, judicial scrutiny must be highly

18  deferential.  *Id*. at 689.  There is a strong presumption that counsel's performance fell within the

19  wide range of reasonably effective assistance.  *Id*.  The Ninth Circuit has made clear that "'[a] fair

20  assessment of attorney performance requires that every effort be made to eliminate the distorting

21  effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

22  evaluate the conduct from counsel's perspective at the time.'"  *Campbell v. Wood*, 18 F.3d 662,

REPORT AND RECOMMENDATION
PAGE -8

01  673 (9th Cir. 1994) (quoting *Strickland*, 466 U.S. at 689).

02      The second prong of the *Strickland* test requires a showing of actual prejudice related to

03  counsel's performance.  The reviewing court need not address both components of the inquiry if

04  an insufficient showing is made on one component.  *Strickland*, 466 U.S. at 697.  Furthermore,

05  if both components are to be considered, there is no prescribed order in which to address them.

06  *Id*.

07      Petitioner's ineffective assistance of counsel claim pertains to the May  14, 1996 tape

08  introduced and transcript used at trial.  Petitioner asserts that Koller, his trial counsel, stipulated

09  to the introduction of this transcript into evidence without objection and without conducting a

10  reasonable investigation into the audibility of the tape upon which the transcript was based.

11      Petitioner's former counsel (Reed) in relation to his successive petition obtained copies of

12  the tapes of the May 1996 conversations from Sanchez's former trial counsel, Jennifer Shaw.

13  Reed, now deceased, gave copies of the tapes to Darryl Carson, a former investigator for the

14  United States Immigration Service, previously qualified as an expert in court for his Spanish

15  speaking ability, and currently a private investigator in California.  Carson concluded as follows:

16          Except for the beginning of the tapes where the DEA Agent conducting the
            case (or a part thereof); I could not hear the tape sufficiently to be able to give any
17          cogent response to what was being said on the tapes.

18          The tapes seem to be garbled to the extent and degree that except for a few
            words here and there; I was unable to understand them in their fullness or meaning.
19

20  (Dkt. 30, Ex. 1.)  Theresa Ortal, another bilingual investigator given the tapes by Reed, opined as

21  follows:

22      As a bilingual expert in investigation and translation – Spanish to English and vice-

REPORT AND RECOMMENDATION
PAGE -9

versa – who was qualified in various courts in this speciality and expertise, it is my opinion that the disjointed fragments contained in all the audio specimens – including that of May 14, 1996 – could not support a transcript which purported to contain word by word transcription of these disjointed and fragmented utterances.

Based on my experience as an investigator, of 26 years, for the Los Angeles County District Attorney's Office and the Orange County Public Defender's Office, it is my opinion that no legally tenable conclusion regarding the nature and content of these recordings can be supported.

Specifically, a conviction of one of the alleged participants, Samuel Mercado, based in whole or in part on incriminating code words supposedly uttered in these conversations by Mr. Mercado would, in my expert opinion, be completely unsupported by anything contained in the examined material that was given to me.

(*Id*., Ex. 4.)  Also, John Mitchell, an audio engineer, rendered the following opinion:

My not knowing the language prevented me from determining the success or failure of the processing.  However, it is my impression that sufficient voice signal strength regarding diction cues is not constantly present on the original recording, rather the voice strength is intermittent in relationship to the environmental noise and creates an unacceptable signal-to-noise ratio.  This results is [sic] diction cues blending with the noise and making individual words impossible to discern.  This sort of recording often results in what we call auditory illusions.  That is, a word formant structure blending with the frequency structure of another sound resulting in the listener believing a specific utterance was spoken when in fact it is something entirely different.  This is a common occurrence and problem with this type of audio.

Although it is likely some words can be clearly understood there is the real possibility of obtaining only partial words and phrases, being the unwitting victim of auditory illusions, and even having areas of dialogue where nothing can be discerned. All of this is likely to result in the misinterpretation of the dialogue content, perhaps even discernible words and phrases being interpreted out of context.  It might be possible to retrieve certain words and phrases through additional forensic processing, but this is a very difficult, time consuming and extremely expensive endeavor with the results being unknown until it is done.  It is my impression that this recording in its current form should be considered to be unreliable.

For the same reasons stated above spectographic voice identification is not feasible.  The voice and noise is blended to such an extent as to render a spectrogram unreadable.

REPORT AND RECOMMENDATION
PAGE -10

01 (*Id.*, Ex. 3.)

02     Upon his appointment, petitioner's current counsel retained the services of federal court

03 certified interpreter Mario Flores to compare a tape of the May 14th conversation to two

04 transcripts – one containing side-by-side Spanish and English, and one solely in English. Flores

05 identified "78 (seventy-eight) material errors classified as 'Omissions, additions, and/or changes'

06 in the transcription from Spanish into Spanish[,]" and "43 (forty three) material errors" in the

07 English only transcript. (*Id.*, Ex. 14.) He further stated:

08     . . . The Spanish-English Transcription and Translation contains many utterances
     labeled "UI" for "Unintelligible," which affects the contextual meaning of individual

09     words, potentially resulting in an inaccurate understanding of what was said in
     Spanish and a distortion of the English translation, since much of the translation is

10     then rendered as literal words in the absence of context.

11     . . . The Spanish-English Transcription and Translation and the English-only
     translation assign utterances to specific speakers by name, which I cannot corroborate

12     without a voice sample of the three main individuals allegedly participating in the
     recorded conversation.

13

14 *Id.*

15     Petitioner notes Koller's apparent awareness of problems with the audibility of the tapes

16 and her employment of a court certified interpreter to review the tapes and transcripts. Petitioner

17 further notes Koller's failure to employ an audio engineer to review the tapes or to make an effort

18 to correctly identify the speakers on the tapes using voice samples of the participants. Petitioner

19 surmises that the individuals who prepared the transcripts likely relied on the assistance of Pantoja,

20 an informant with questionable credibility, to determine voice identification. He maintains that

21 reasonably competent counsel should have done more to investigate the accuracy and authenticity

22 of the transcripts and should have objected to the admission of the tape into evidence. Petitioner

REPORT AND RECOMMENDATION
PAGE -11

01   also avers that Koller should have used the differences between the various transcripts to impeach

02   the transcript used at trial.  He argues that, given that the evidence against him consisted largely

03   of the testimony of a paid informant with minimal corroborating evidence, there is a reasonable

04   likelihood that, but for Koller's errors, the result of the trial would have been different.

05          Respondent provides and the record reveals more detailed information regarding the May

06   14th tape and transcripts.  The government initially had the May 1996 conversations translated by

07   Brian Clarke of Pro Trans, an independent translation company.  Clarke produced the above-

08   described side-by-side transcription of Spanish and English.  The government gave the tapes and

09   transcripts to Koller and Shaw.

10          Koller hired Glenna White to review the May 14th tape and transcript.  In a letter to Lydia

11   Serafin of the Federal Public Defender's Office, White wrote as follows:

12          Enclosed are the pages with changes I would make to the transcription you
     sent me.  While the transcription on the whole is of good quality, there indeed are a

13   few places where words are missed or, in a couple of instances, changed.  I have
     opted to circle the portion of each page where I made changes, and the attached

14   changes could be collated into the original version. . . .

15          My only other "doubt" regarding this original transcription is the use of the
     word "house" for the Spanish "rancho."  It may well be they were referring to a

16   house, but I personally have not heard the word used that way, so I wouldn't want to
     make the assumption it necessarily referred to a house, especially in light of the

17   subject matter of the rest of the tape.

18   (Dkt. 43, Ex. B.)   Koller forwarded White's revised transcript to Shaw and noted in an

19   accompanying letter: "Lydia Serafin actually thinks that she can hear more on the tape than Glenna

20   was able to discern.  She is going to talk to Glenna about this."  (*Id.*, Ex. C.)

21          Koller also forwarded White's revised transcript to the government.  In a responsive letter,

22   the government indicated it had retained interpreter Griselda Ruiz to review the May 14th tape and

REPORT AND RECOMMENDATION
PAGE -12

01  transcripts, "to compare [the] revised portions of the transcript, and to prepare another revised

02  English and Spanish transcript." (*Id.*, Ex. E.)  The government informed Koller and Shaw that,

03  "[i]f necessary, [they could] have Glenna and Griselda meet to resolve any differences they have

04  in their translations." (*Id.*)  In a subsequent letter discussing the May 14th tape, the government

05  indicated that Ruiz had "been able to hear and translate portions of the conversations which were

06  originally identified as 'unintelligible' in the draft of the transcript prepared by Brian Clark[,]" and

07  offered to pay for White's time in working with Ruiz on an agreed transcript. (*Id.*, Ex. H.)  Ruiz

08  subsequently produced two transcripts, one in Spanish and the other in English.  (*See* Dkt. 30, Ex.

09  8 (English version.))

10          At some point prior to trial, Koller had an individual in her office, Dan Crocker, research

11  the law and arguments supporting exclusion of the May14th tape based on inaudibility. (Dkt. 30,

12  Ex. 10.)  The resulting memorandum notes that "[t]ape recordings that are partially inaudible are

13  admissible unless the defendant establishes that the unintelligible portions are so substantial, in

14  view of the purpose for which the tape is offered, as to render the entire recording as

15  untrustworthy." (*Id.* at 1 (emphasis removed and cited cases omitted.))  It further notes that

16  "audibility of a recording goes to the weight of the evidence, a jury question, rather than the

17  admissibility thereof[,]" and that the determination of whether the recording is untrustworthy lies

18  within the discretion of the trial court.  (*Id.* at 2 (cited cases omitted.))  Crocker indicated: "Most

19  of the cases that I found where defendants raised the inaudibility issue, the district courts admitted

20  the tapes and were upheld on appeal." (*Id.*)  He also discussed two cases where reviewing courts

21  found no error in the refusal to admit partially inaudible tapes, but noted that "the determination

22  of admissibility of tapes is a factual one which is not set out in the case law." (*Id.* at 3.)  Crocker

01  thereafter discussed two possible arguments against admission of the tape, first, that the

02  unintelligible portions were so substantial as to render the tape untrustworthy, and, second,

03  because the tape records a Spanish language conversation, that the jury could not on their own

04  assess the probative value of the tapes or reconcile any discrepancies between the transcription and

05  the recording.  (*Id*. at 3-5.)

06      In support of a motion to suppress items seized during the search of petitioner's home and

07  any fruits of that search, Koller described the May 14th tape as "so garbled as to make the ensuing

08  conversation entirely incomprehensible."  *See United States v. Mercado-Ulloa*, No. CR 96-415C

09  (Dkt. 40 at 3).  In an attached affidavit, Koller added:

> I have reviewed the transcript provided by the government, which contains an
> English translation.  The tape is of poor quality.  According to the transcript, and as
> verified by a Spanish speaking investigator who listened to the tape, the majority of
> the material it contains is inaudible, and the portions which can be understood are
> without context.  There is no direct mention of cocaine or drug dealing audible on this
> tape.

14  (Dkt. 46, Ex. O.)  Koller also mentioned the audibility issue in her opening and closing arguments

15  at trial, first describing it as "a very poor quality tape[,]" and later stating:  "It is not totally clear,

16  the tape isn't good[.]"  TR 45-46, 414.

17      Koller did not, however, move the Court to exclude the May 14th tape or otherwise argue

18  against its admission.  Instead, when the government suggested at trial that petitioner would be

19  stipulating to the use of a transcript of the May 14th conversation, Koller stated as follows:

> Actually, I would like to state my position.  It is a little less simple than that.
> I am willing to stipulate that this is the transcript that the informant and the interpreter
> came up with when they listened to a tape.

> I am not necessarily stipulating that it is entirely accurate.  I would reserve the

REPORT AND RECOMMENDATION
PAGE -14

01    right to cross-examine the informant about it. That's my first caveat.

02    And the second is, I don't know what Mr. Miyake was anticipating in this regard, but I would not agree that this should go with the jury when they are deliberating, because the transcript should not be evidence.

03

04    TR 177-78. Koller agreed that there was "no point in playing the [Spanish language] tape" and

05    that there was no need to have Ruiz testify about the accuracy of the transcript. TR 178-79. She

06    later stipulated to the admission of the tape without the testimony of a UNET detective. TR 265-

07    66. The government used the English version of the May 14th transcript prepared by Ruiz and

08    the transcript Clarke prepared of the May 9th conversation as aids for the jury. (*See* Dkt. 43, Ex.

09    L and Dkt. 30, Ex. 8.) On cross examination, Koller elicited testimony from Pantoja that "a lot

10    that was on the tape recorder wasn't clear because of static and other people talking." TR 302.

11    Considering the record as a whole, petitioner fails to demonstrate that Koller's

12    performance fell below an objective standard of reasonableness. Moreover, an evidentiary hearing

13    would not alter this conclusion.

14    First, the record shows Koller reasonably concluded that the May 14th tape was at least

15    partially audible. In advance of trial, three professional interpreters, including one hired by Koller,

16    and one of Koller's Spanish speaking co-workers found portions of the tape intelligible. (*See*, *e.g.*,

17    Dkt. 43, Ex. B. (Glenna White wrote: "While the transcription [by Clarke] on the whole is of good

18    quality . . . ."); Ex. C ("Lydia Serafin actually thinks that she can hear more on the tape than

19    Glenna was able to discern.")) Nothing in the record suggests the need for a sound engineer. Nor

20    does there appear to have been any significant confusion in terms of voice identification. Indeed,

21    Pantoja was not the only participant to the conversation available to review the tapes for this

22    purpose. If anything, it can be said that Koller effectively used an interpreter and Spanish speaking

REPORT AND RECOMMENDATION
PAGE -15

01    coworker to make corrections to the transcript produced by the government.  That different

02    interpreters later identified additional discrepancies between the various May 14th transcripts and

03    offered different opinions as to the quality of the tape and transcripts is not particularly surprising,

04    nor does it establish that Koller acted unreasonably at the time of her representation.

05         Second, Koller's decision to not object to the admission of the May 14th tape or the use

06    of a transcript of that tape can be said to fall within the wide range of reasonably effective

07    assistance.  The legal memorandum on this issue reveals Koller's consideration of the issue and

08    provides justification for her ultimate decision to forego the argument against admission.  ( *See*

09    Dkt. 29, Ex. 10.)  Petitioner does not demonstrate any error in the legal analysis contained in the

10    memorandum.  *See*, *e.g.*, *United States v. Tisor*, 96 F.3d 370, 376 (9th Cir. 1996) ("'A recorded

11    conversation is generally admissible unless the unintelligible portions are so substantial that the

12    recording as a whole is untrustworthy.'") (quoting *United States v. Lane,* 514 F.2d 22, 27 (9th

13    Cir. 1975)).  Nor does he otherwise establish, given the law governing this issue, that the decision

14    to not object fell below an objective standard of reasonableness.

15         Third, the actions Koller did take at trial with respect to the tape and transcript fell within

16    reasonable bounds.  Koller did not simply allow the admission of the tape and use of the transcript

17    without comment.  Instead, she stipulated that the transcript used at trial was "the transcript that

18    the informant and the interpreter came up with when they listened to a tape[,]" declined to

19    stipulate that the transcript was "entirely accurate[,]" and made reference to the poor quality of

20    the tape from which the transcript was made in both her argument and cross examination of

21    Pantoja.  TR 45-46, 302, 414.  Because the tape contained a Spanish-language conversation,

22    Koller reasonably agreed that it need not be played for the jury.  Moreover, Koller used portions

REPORT AND RECOMMENDATION
PAGE -16

01   of the tape deemed intelligible to her client's benefit in repeatedly arguing and establishing through

02   questioning that there was no mention of drugs on the tape, while the conversation did include

03   discussion of getting work in the pine tree business.  (*See, e.g.*, TR 304 ("[A]nd yet not one word

04   on that tape from the May 14th conversation mentions drugs, does it?"); TR 414 ("It is not totally

05   clear, the tape isn't good, but it is clear that there is conversation about the pine tree business, and

06   it is clear that nobody says it is a cover operation or a front.  Samuel Mercado needed work.  The

07   family restaurant had closed four months early.  His family was planning on moving to Mexico.

08   That's why he was at the May 14th meeting, to talk about getting some work in the pine

09   business."); TR 428 ("The one time that there is proof that those three people ever got together

10   in the same place at the same time, the government made a tape, and there is still no drug talk to

11   bring before you as a jury, because it wasn't a conversation about drugs."))[1]

12        In sum, petitioner fails to establish that his trial counsel's performance fell below an

13   objective standard of reasonableness or that an evidentiary hearing is required with respect to this

14   claim.[2]  As such, petitioner's first ground for relief should be denied.

15   B.   Newly Discovered Evidence and Governmental Misconduct

16        In the statement sent to this Court in May 2001, Sanchez indicated petitioner had nothing

17   to do with the drug activity at issue in this case and that, rather than stating that he worked for an

18   _____

19        [1] It should also be noted that, contrary to petitioner's contention, it does not appear that
     the May 14th tape was the only evidence Pantoja and petitioner had direct contact.  A UNET
20   detective agreed in testimony that "[p]hotographs were in fact taken of Gilberto [Sanchez] and
     Samuel Mercado driving up and meeting with Mr. Pantoja outside of a McDonald's[.]" TR 181-
21   82.  It is not clear, however, whether those photographs were introduced into evidence.

22        [2] Given this finding, the Court need not address the second prong of the *Strickland*
     analysis.  *See* 466 U.S. at 697.

REPORT AND RECOMMENDATION
PAGE -17

01   individual in Bellingham, Sanchez told agents he worked independently and that he could direct

02   them to his drug suppliers in California. (  *See* Dkt. 30, Ex. 15.)  Sanchez reaffirmed these

03   assertions in discussions with petitioner's previous and current habeas counsel.  (*Id*., Exs. 16-21.)

04   Here, in his second ground for relief, petitioner asserts his entitlement to a new trial based on this

05   "newly discovered evidence."   He also asserts his entitlement to habeas relief based on the

06   government's failure to disclose this exculpatory evidence and its use of perjured testimony on this

07   issue at trial (*see*, *e.g.*, TR 87-88 (Detective Zweiger testified that, shortly after his arrest, Sanchez

08   indicated he worked for someone in the Bellingham area)).

09        Section 2255 allows for certification of a second or successive petition with an indication

10   of "newly discovered evidence that, if proven and viewed in light of the evidence as a whole,

11   would be sufficient to establish by clear and convincing evidence that no reasonable factfinder

12   would have found the movant guilty of the offense[.]"  Entitlement to a new trial based on newly

13   discovered evidence requires a petitioner to establish that:  (1) the evidence was newly discovered;

14   (2) the petitioner exercised due diligence in uncovering the new evidence; (3) the new evidence

15   is not merely cumulative or impeaching; (4) the new evidence is material to the issues involved;

16   and (5) the new evidence is such that the petitioner would probably be acquitted in a new trial.

17   *United States v. Jackson*, 209 F.3d 1103, 1106 (9th Cir. 2000).

18        Pursuant to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), suppression of evidence favorable

19   to the accused violates due process where that evidence is material to guilt or punishment,

20   irrespective of the good or bad faith of the prosecution.  A *Brady* violation would establish "an

21   error of constitutional dimension justifying postconviction relief under section 2255."  *Bauman*

22   *v. United States*, 692 F.2d 565, 572 (9th Cir. 1982).  A conviction may also be reversed through

REPORT AND RECOMMENDATION
PAGE -18

01    a demonstration of the government's knowing use of perjured testimony.  *See United States v.*

02    *Sherlock*, 962 F.2d 1349, 1364 (9th Cir.1992).

03          Petitioner maintains that he satisfies the standard for newly discovered evidence, stating

04    that the Sanchez evidence was not discovered until May 2001, that he acted with due diligence

05    in pursuing this claim,[3] that the evidence goes to the heart of and is clearly material to the

06    government's case, and that Sanchez's testimony, if deemed credible, would likely result in

07    petitioner's acquittal.  He further argues that this evidence supports his contention of both *Brady*

08    violation and the government's knowing use of perjured testimony.  Petitioner avers that his

09    preliminary showing on these claims entitles him to an evidentiary hearing.  *See*, *e.g.*, *Bauman*, 692

10    F.2d at 573 ("Only if the record 'conclusively' demonstrated the lack of merit of [the claim as to

11    a *Brady* violation] was the district court correct in dismissing it without ordering an evidentiary

12    hearing.")  However, for the reasons discussed below, and as argued by respondent, the Court

13    finds no basis for either holding an evidentiary hearing or granting petitioner habeas relief.

14          First, Sanchez's statement does not qualify as "newly discovered" evidence.  Sanchez

15    chose not to testify at trial. ( *See* Dkt. 46, Attach. P (written statement signed by Sanchez

16    acknowledging his right to testify, but declining to exercise that right)).  "When a defendant who

17    has chosen not to testify subsequently comes forward to offer testimony exculpating a

18    codefendant, the evidence is not 'newly discovered.'"  *United States v. Diggs*, 649 F.2d 731, 740

19    (9th Cir. 1981), *overruled sub silentio on other grounds by United States v. McConney*, 728 F.2d

20    1195 (9th Cir. 1984).  *See also United States v. Lockett* , 919 F.2d 585, 592 (9th Cir. 1990)

21

22          [3] Petitioner explains that any delay resulted from the death of his former counsel.

REPORT AND RECOMMENDATION
PAGE -19

01 (rejecting the argument that "'newly available evidence'" can constitute newly discovered

02 evidence; agreeing that "'a court must exercise great caution in considering evidence to be "newly

03 discovered" when it existed all along and was unavailable only because a codefendant, since

04 convicted, had availed himself of his privilege not to testify.'") (quoting *United States v. Jacobs*,

05 475 F.2d 270, 286 n. 33 (2d Cir. 1973)).  As explained by the Ninth Circuit:

> It would encourage perjury to allow a new trial once co-defendants have determined
> that testifying is no longer harmful to themselves. They may say whatever they think
> might help their co-defendant, even to the point of pinning all the guilt on themselves,
> knowing they are safe from retrial. Such testimony would be untrustworthy and
> should not be encouraged.

09 *United States v. Alvarado*, 963 F.2d 1184, 1188 (9th Cir. 1992) (finding a mere allegation that

10 codefendants' attorneys prevented them from testifying insufficient to establish that the

11 codefendants' testimony was newly discovered).  As such, while Sanchez's statement and

12 proposed testimony is arguably newly available, it is not newly discovered evidence entitling

13 petitioner to a new trial.

14     Moreover, even without consideration of the law regarding a non-testifying codefendant,

15 it is questionable whether this evidence could otherwise be deemed newly discovered.  That is,

16 much of the information relevant to this ground for relief was available at the time of trial.  For

17 example, as discussed further below, testimony from Detective Zweiger reflected Sanchez's post-

18 arrest statement that he worked for a California supplier and offered to provide information

19 regarding that supplier, as well as his failure to implicate petitioner.  *See* TR 117-20.  In fact,

20 petitioner appeared to raise these same arguments, albeit in a conclusory fashion, in the first habeas

21 petition he filed in this Court in 1999.  *See Mercado-Ulloa*, No. C99-314JCC (Dkt. 1).  While

22 petitioner did not at that time possess a written statement by Sanchez, his apparent knowledge as

REPORT AND RECOMMENDATION
PAGE -20

01 | to the substantive basis for this claim calls into question his assertion that the evidence was, in fact,

02 | newly discovered, and that he exercised due diligence in uncovering this evidence.

03 |      Second, petitioner is procedurally barred from pursuing his *Brady* claim. A matter

04 | adversely decided on direct appeal cannot be relitigated in a § 2255 petition. *See United States*

05 | *v. Scrivner*, 189 F.3d 825, 828 (9th Cir. 1999) (citing *Odom v. United States*, 455 F.2d 159, 160

06 | (9th Cir. 1972) ("The law in this circuit is clear that when a matter has been decided adversely on

07 | appeal from a conviction, it cannot be litigated again on a 2255 motion.")) As indicated above,

08 | petitioner raised this very argument in a supplemental *pro se* brief supporting his appeal in the

09 | Ninth Circuit. (*See* Dkt. 43, Ex. J.) (*See also id.,* Ex. A (the Ninth Circuit described petitioner's

10 | argument as follows: "Mercado argues that the government failed to disclose Sanchez's post-

11 | arrest statement to Detective Zweiger in which Sanchez stated that he worked for someone other

12 | than Mercado and was willing to name his cocaine suppliers in California in violation of *Brady*.

13 | . . .")) The Ninth Circuit affirmed petitioner's conviction, stating with respect to this argument:

14 | "Assuming this issue isn't waived, there is no *Brady* violation because Sanchez's statements were

15 | brought out in examination and cross-examination of Zweiger." (*Id.*, Ex. A.) Petitioner is,

16 | therefore, procedurally barred from pursuing this claim.

17 |      Finally, as acknowledged by the Ninth Circuit, the record does not support petitioner's

18 | contention of governmental misconduct. Detective Zweiger confirmed that Sanchez did not

19 | provide a name for an individual in Bellingham, that Sanchez indicated he had a supplier in

20 | California and offered to provide information as to that supplier, and that, in response to

21 | questioning, Sanchez said he did not know petitioner. TR 117-20. This testimony provided a

22 | sufficient description of Sanchez's post-arrest statements. (*See also* Dkt. 43, Ex. A (the Ninth

REPORT AND RECOMMENDATION
PAGE -21

01  Circuit stated in rejecting a confrontation clause argument as to admission of Sanchez's post-arrest

02  statement regarding working for someone in Bellingham and the failure to sever the trials of

03  Mercado and Sanchez: "Mercado did not ask for a limiting instruction; and in light of surveillance

04  that tracked Sanchez to Mercado's residence twice, the pager used to contact them both, evidence

05  taken from Mercado's home, and the testimony of Pantoja linking Mercado to the sale of cocaine,

06  Sanchez's statement that he worked for 'someone in Bellingham' was far from the most damaging

07  evidence against Mercado."))

08        In sum, petitioner fails to establish his entitlement to either an evidentiary hearing or habeas

09  relief based on newly discovered evidence or governmental misconduct.  Accordingly, petitioner's

10  second ground for relief should also be denied.

11                                    <u>CONCLUSION</u>

12        For the reasons set forth above, the Court recommends that petitioner's § 2255 motion be

13  DENIED.  No evidentiary hearing is required as the record conclusively shows petitioner is not

14  entitled to relief.  A proposed Order of Dismissal accompanies this Report and Recommendation.

15        DATED this <u>5th</u> day of February, 2007.

16

17                                    Mary Alice Theiler
                                      United States Magistrate Judge

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -22